SO ORDERED.

SIGNED May 22, 2012.



HENLEY A. HUNTER
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

IN RE:                                                          CASE NO: 09-80766

    JOSEPH LARRY KERRY

       (Debtors)

CARDIOVASCULAR SURGERY OF ALEXANDRIA, LLC          ADVERSARY NO. 09-8041

TOMMIE T. GRANGER

       (Plaintiff)

VERSUS

JOSEPH LARRY KERRY

       (Defendant)

## REASONS FOR DECISION

The trial of this matter was held on March 30, 2012. This is a Core Proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (I). This Court has jurisdiction pursuant to 28 U.S.C. §1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 83.4.1 incorporated into Local

Bankruptcy Rule 9029.3. No party has sought to withdraw the reference, nor has the District Court done so on its own motion. This Court makes the following Findings of Fact and Conclusions of Law in accordance with F.R.B.P. 7052. Pursuant to these reasons, Judgment is Granted in favor of the DEFENDANT.

## PROCEDURAL HISTORY

The defendant/debtor, Mr. Joseph Kerry, filed a Chapter 7 Petition on June 22, 2009. Prior to the filing of the bankruptcy case, debtor had been married to Donna Kerry, who had been employed by the Plaintiffs as an office manager and pled guilty to 17 counts of theft greater than $500 from the Plaintiff(s) on July 6, 2009.[1] Debtor's judgment of divorce was rendered in the 9th Judicial District Court on October 7, 2010. The parties stipulate that over the course of her six year employment as office manager, Donna Kerry stole over $400,000.00 from the Plaintiffs. She was sentenced to ten years in prison and to make restitution in the amount of $318,383.03. (Doc. #74 Exhibit 2, pg. 10.)

On May 8, 2008, Plaintiffs filed a civil suit in the 9th Judicial District Court of Louisiana against debtor and Donna Kerry, Maryland Casualty Company and Bank of America. No motion to lift the stay was ever filed in this Court to pursue this state court civil action.[2]

Plaintiffs filed the instant Petition to determine the dischargeability of a debt on October 16, 2009, one day prior to the expiration of the time to file an adversary complaint alleging dischargeability. The particular debt alleged to be non-dischargeable is listed by the debtor on Schedule F (Unsecured Claims) as to Cardiovascular Surgery of [Alexandria] and to Tommie Mack Granger, both in an "unknown" amount. On the last day to file claims, Cardiovascular Surgery of Alexandria filed its claim in the amount of $412,455.89 as "Community debts based on thefts by spouse." The original Petition alleges this claim is non-dischargeable under §§523(A)(2)(a) ("for money, property, services, . . . obtained by false pretenses, a false representation, or actual fraud") and (a)(6) ("for willful and malicious injury by the debtor to another entity or to the property of another entity").

The original petition alleged that Donna Kerry was employed by plaintiff in a fiduciary capacity and stated:

---

[1] It is undisputed that while married, the Kerrys obligations were community.

[2] An incomplete state court record of the civil action was filed as an exhibit herein to the defendant's Motion for Summary Judgment, reflecting that the civil action proceeded to judgment against the insurance company, but does not show whether the suit was stayed as to Joseph Larry Kerry or proceeded. That record does reflect, however, that Judgment was entered against Maryland Casualty Company for up to $75,000 for each occurrence during the contract period. CSA has not amended its claim against the debtor to allow for any credit.

2

[T]he illegal activities of Mrs. Kerry had to have occurred with the full knowledge of the debtor, as the married couple shared all bank accounts, all assets illegally obtained from Mrs. Kerry's criminal actions, including but not limited to an impressive residence, vehicles, vacations, and other movables, all resulting in a lifestyle far above the earnings that the debtor and Mrs. Kerry could possibly afford, absent the ill-gotten gains. Debtor's knowledge constitutes a basis for denying the discharge of his indebtedness to Granger pursuant to 11·U.S.C. §523(a)(2)(A) and/or 11 U.S.C. §523(a)(6).

(Petition, Doc. 1, ¶8.) On December 19, 2009, defendant filed a Motion to Dismiss the Plaintiffs' Petition under F.R.B.P. 7012 for failure to state a claim upon which relief can be granted, asserting that the facts alleged in the petition did not support a claim under §§523(a)(2)(A) and (a)(6). The Motion was noticed for a hearing on January 13, 2010. Counsel for plaintiff filed a Motion to Continue the hearing on the Motion to Dismiss, which was granted, setting the hearing for March 10, 2010. An objection to the Motion was filed until March 1, 2010, urging that the facts did support a claim under §§523(a)(2)(A), but also under the heretofore unmentioned §523(a)(4) ("for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny"). At the March 10, 2010 hearing, the Court granted the Motion, but allowed the plaintiff fifteen days to amend the complaint to allege dischargeability under §523(a)(4).

However, on March 15, 2010, this Court on *sua sponte* reconsideration and a review of the original complaint, found that the amendment would be unnecessary as the original complaint alleged the fiduciary relationship of Donna Kerry to plaintiff, but since that fact, even if true, did not extend to create a fiduciary relationship or other culpability between debtor and plaintiff, the Court amended its ruling to grant the Motion to Dismiss in its entirety. Plaintiffs requested leave to appeal, which was denied, but construed by the Court as a timely Motion for Reconsideration and set same for hearing on April 28, 2010.[3]

Prior to the hearing on Reconsideration of the Motion to Dismiss, Plaintiffs amended the complaint to allege dischargeability under §§523(a)(2) and (a)(4). Based on the arguments at the hearing on Reconsideration, this Court found that pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) and *Bell Atlantic Corporation et al v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), leave to appeal should not have been granted and the Motion to Dismiss was granted.

On appeal, the United States District Court clarified the application of *Iqbal* and *Twombly*, and this Court's misapplication of same, noted the facts as alleged were sufficient to survive a Motion to Dismiss under F.R.B.P. 7012, and remanded the adversary proceeding for Plaintiffs to proceed as to its dischargeability under §523(a)(2)(A) and (a)(4).

---

[3] The Court's reconsideration was based, in part, on the then recent case of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) and its discussion of *Bell Atlantic Corporation et al v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007).

After a scheduling conference in May of 2011, Answers were filed to both the original and amended Complaints. On September 21, 2011, defendant filed a Motion for Summary Judgment, and rather than recite the irrelevant procedural details of same, suffice it to say that the Motion for Summary Judgment was denied on the basis that there existed an issue of material fact as to whether the criminal actions of Donna Kerry could be imputed to Joseph Kerry. A trial date was scheduled, continued, and eventually held on March 30, 2012.

The Pre-trial Stipulation filed by the parties narrowed the Plaintiffs' grounds for relief to a claim of dischargeability under §523(a)(4) only. (Doc. #93, ¶¶2,7.)[4] 11 U.S.C. §523(a)(4) provides: "A discharge under section 727 . . . does not discharge an individual debtor from any debt – (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." After the trial, at which Dr. Tommie Granger and Joseph Kerry testified, the parties were permitted until May 11, 2012 to file post-trial briefs and replies, and the matter was taken under advisement.

## FINDINGS OF FACT AT TRIAL

Donna Kerry worked for Dr. Granger in his former practice, MacArthur Surgical Clinic, prior to the opening of his new practice as Cardiovascular Surgery of Alexandria, LLC in 2002. On opening the new practice, Donna Kerry was employed as his office manager until her dismissal in 2008. Although Dr. Granger could not state for sure, he estimates that during that period, the practice employed between 3-6 employees and 3-6 other employees who operated medical equipment, but also worked for other physicians. In 2002, Donna Kerry was paid a salary of $40,000 plus bonuses, which were not regularly scheduled, but according to Dr. Granger, were made sporadically during the year in the $2,500 range. Dr. Granger testified that while he engaged in the practice of medicine, he trusted Donna Kerry to be the office manager, which included being the exclusive bookkeeper and meant she handled all deposits, credit card purchases, receipts of mail and payments, and payroll to the extent necessary to communicate the payroll information to the electronic payroll provider. Dr. Granger was the check signer, and authorized Donna Kerry to prepare checks for his review and signature. Dr. Granger also had a signature stamp, which was used for clinical purposes by his nurse, but not kept in a secure location.

Dr. Granger testifies that in 2005, he employed a Certified Public Accountant from New Orleans ("Mr. Rigby") to audit the business of the practice because he wondered why he worked so hard while not seeing an acceptable increase in the amount of his own earnings. This same accountant had access to his books and records and filed Dr. Granger's personal and business tax returns. On evaluation of the

---

[4] Counsel for Plaintiffs also orally specified in opening argument at trial that the only exception under which Plaintiffs pursued relief was the §523(a)(4) exception, and all other grounds asserted in the Original and Amended complaints were abandoned.

4

business, the accountant, according to Dr. Granger, saw no major problems. However, the accountant arranged to prepare and submit a report with recommendations to Dr. Granger once he returned to New Orleans, but shortly thereafter, his efforts were interrupted by Hurricane Katrina, and the report was never submitted.

In March of 2008, Dr. Granger testified that he received a call from his banker informing him that the practice account was overdrawn and that there had been multiple checks written to Donna Kerry. The manner in which Donna Kerry is alleged to have engaged in the theft of funds varied, including using the signature stamp to write checks to herself or to pay her personal bills, and then entering the check in the business records as a legitimate expense; giving herself unauthorized bonuses through the payroll system; and the unauthorized use of credit accounts. Dr. Granger testified that he reviewed the bank statements cursorily, but only after Donna Kerry opened them and removed the canceled checks. Explaining his own failure to discover the theft, Dr. Granger admitted he should have exercised greater control over the business affairs and importantly, that he believed Donna Kerry probably lied to her husband as well, regarding their own financial affairs.

Mr. Kerry is a high school graduate who was and is employed as the local manager of Auto Chlor Systems. He testified that he now earns a salary of approximately $70,000 per year, and during the time of Donna Kerry's employment to Plaintiffs, earned approximately $60,000 per year. He stated that Donna Kerry told him that she made more money than he did, that he never saw her paychecks. Mr. Kerry testified that he would turn his paycheck over to Donna Kerry for deposit. He stated that Donna Kerry paid all the bills, made all deposits, engaged in all of the household spending and made all vacation arrangements. He explains this arrangement of delegating the household finances to her began when they were married because he worked offshore and was not home. He did not monitor her spending, but asked whether she charged purchases, and she told him that she did not. He admitted that before they were married she lied to him regarding the amounts of her debts. During their marriage, Mr. Kerry liked to fish and hunt, and stated that he would collect aluminum cans throughout the year to pay for his yearly $400 hunting lease.

Plaintiffs allege the Kerrys lived far beyond their legitimate means. It is undisputed that they had three children, and that Mr. Kerry had two older children from a prior marriage. Dr. Granger testified that Donna Kerry drove what appeared to be a new Ford Expedition in 2002, but drove that same car during her term of employment. Mr. Kerry has always driven a company truck. Plaintiffs allege the tuition for private school was extravagant; while Mr. Kerry said he did not know that it cost between $700-$800 per

5

month total for all three children, until he assumed responsibility for paying the bills after his separation from Donna Kerry.

It is undisputed that the Kerrys took a vacation to the beach each summer, once went to Branson, Missouri, and that before the birth of their third child, they once went to Disney World for a week and stayed in a condominium. In addition, Mr. Kerry states that he and Donna Kerry attended two days of the Masters Golf Tournament in Augusta, Georgia for her birthday one year. No evidence was presented on the specific amounts paid for these trips. Mr. Kerry testified that Donna Kerry made all payment arrangements and "check-ins" on vacation.

The last allegation regarding the extravagance of the Kerrys lifestyle involves their home, but the evidence adduced on this issue was not precise as to amounts or dates of purchase. But what is not disputed is that Kerrys originally lived in a home Mr. Kerry purchased for $82,000, prior to their marriage. At some point during her employment with Plaintiffs, they sold the home for $170,000, and purchased a newly built home, worth approximately $350,000. Mr. Kerry stated at trial that he was confused at the time he signed the mortgage about the purchase price, that he thought the mortgaged amount would be between $130,000-$140,000.[5]

Mr. Kerry consistently maintains that he did not know of his wife's theft. Even when Donna Kerry was fired, he testified that she told him she was not going back to work after she and Dr. Granger had an argument because Dr. Granger wanted to reduce her salary. When Dr. Granger subsequently told Mr. Kerry of the theft, Mr. Kerry asked whether she would be arrested. There is no evidence that Joseph Kerry was criminally prosecuted as a principal to his wife's crime.

Admitted into evidence was a ledger containing copies of the 120 unauthorized checks written by Donna Kerry, most of the checks were payable to Donna Kerry, but six of the 120 checks were written to Joseph Kerry as one of two or the only payee: on December 8, 2002, January 24, 2003, February 18, 2003, January 10, 2005, April 6, 2005, and August 10, 2006. Mr. Kerry denies ever receiving or seeing checks in payment from Plaintiffs. Plaintiffs do not allege specifically that Joseph Kerry actually received and endorsed them. The last check written to Joe Kerry on August 10, 2006 was in the amount of $19,401. (Exhibit P-2-13.) Plaintiffs did not submit a copy of the endorsement on that check.

---

[5] According to the state court deposition of Jespeh Larry Kerry, taken on November 20, 2008, the amount of the mortgage was between $290,000 and $300,000. (Doc. #74, Ex. 7, pg. 85). However, neither the record of the bankruptcy case nor the entirety of the record of the Adversary Proceeding, including the exhibits to the Motions, were admitted into evidence via incorporation by reference.

Also admitted was the deposition of Donna Kerry, taken on September 29, 2009. Therein, she denies any other method of stealing from Plaintiffs than the unauthorized use of Dr. Granger's signature stamp to write checks payable to herself, her bills and expenses, and Mr. Kerry. She testified that Dr. Granger paid her $40,800 in yearly salary, plus a $5,000 bonus every quarter, and a $10,000 yearly Christmas bonus. (Exhibit P-4, pg. 27-28.) She testifies that Dr. Granger authorized random pay increases and bonuses for several employees, not in writing, but by telling her to make the adjustment, and she would keep record of it in an employee file. (Exhibit P-4, pg. 35.) Donna Kerry stated that Mr. Kerry did not have a checkbook while they were married and never checked the mail. (Exhibit P-4, pg. 60.) As for her spending during the marriage, she stated that she never made flashy purchases that would have drawn attention, but that she spent money on her children, purchasing clothes for them excessively, for example, and telling them to just put them in their closets. (Exhibit P-4, pg. 62-63.) She specified that Mr. Kerry would not inspect their purchases or closets, and that he had "no care in the world about any of that." (Exhibit P-4, pg. 63). Based on where they lived and what clothes they wore, when specifically asked, "Do you believe he should have known," Donna Kerry answered, "I don't think – I know he did not know. . . He didn't know what my salary was. He thought we were doing fine. Like I said, we had no other bills. He didn't know about the credit cards. . . . He thought we had a house note, and that was it." (Exhibit P-4, pg.65-66.) Throughout the remainder of the deposition of Donna Kerry, there are various descriptions of the kinds of charges Plaintiffs authorized employees to make, including, but not limited to, allowing employees to charge gasoline purchases rather than paying actual mileage for use of their personal vehicle; authorizing the use of the practice credit cards to reward some employees with trips; none of which she states was a part of a uniform, documented policy or exchange.

## CONCLUSIONS OF LAW

Plaintiffs allege the §523(a)(4) exception applies to the debtor by imputation of Donna Kerry's theft because they allege he "had to have known" and therefore acquiesced in his wife's criminal activity. But this Court must ask first, was her "theft" under La.R.S. §14:67A either a fiduciary fraud or defalcation, embezzlement or larceny within the context of §523(a)(4)? Second, did the Plaintiffs meet the burden of proof to impute her theft to the debtor?

### Analysis of §523(a)(4)

A creditor has the burden of proof in an action to determine the dischargeability of a debt under §523(a). *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Louisiana Marine*

7

*Towing, LLC v. Bertrand (In re Bertrand)*, 2011 WL 3664474, pg.1 (Bankr.W.D.La. 8/19/2011)(*quoting Hudson v. Raggio & Raggio, Inc.*, 107 F.3d 355, 356 (5th Cir.1997). Accordingly, a creditor must establish each and every element of a statutory exception to discharge under 11 U.S.C. § 523 *et seq.* by a preponderance of the evidence. The elements of a nondischargeability claim are a matter of federal law. *Id.*

The proof of claim in the bankruptcy case was filed by Cardiovascular Surgery of Alexandria, LLC, but the Court notes that Dr. Granger, personally, is also a plaintiff in this complaint. Federal courts must examine their own jurisdiction, which necessarily involves determining a plaintiff's standing. *Andrews v. Wells (In re Wells)*, 368 B.R. 506 (Bankr.M.D.La. 11/21/2006)(*citing FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596 (1990) (although no party raised standing, the court must address the issue) and *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315(1984)( "[S]tanding 'is perhaps the most important of [the jurisdictional] doctrines.'")). Therefore, this Court must address whether Dr. Granger has standing as plaintiff in this adversary proceeding, even though the parties did not raise it. Donna Kerry was employed by Cardiovascular Surgery of Alexandria, LLC (hereinafter "CSA").

Under the Bankruptcy Code, a creditor is defined as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). CSA filed its proof of claim, and the recognition of the claim on Schedule F is not listed as "disputed," nor has debtor filed an Objection to the Proof of Claim and it is deemed valid until debtor objects and this Court sustains the objection. *In re Simmons*, 765 F.2d 547, 556 (5th Cir.1985). Therefore, as of this date, CSA is a creditor and as such has standing to object to discharge. But does Dr. Granger, individually, have standing as a creditor? A shareholder may sue for breach of fiduciary duty to a corporation "[i]f the breach of fiduciary duty causes a direct loss to the shareholder or causes damage affecting the shareholder personally ...." *In re Wells*, 368 B.R. at 511 (*quoting Monroe v. Baron One, L.L.C.*, 902 So.2d 529, 533–34 (La.App. 5th Cir.2005). While neither specifically alleged to have standing, nor was the doctor's standing disputed by debtor, Dr. Granger as member of CSA, LLC, alleged at trial that the debt incurred by the Kerry community affected his own personal income from the practice, and thus has standing to bring a claim of non-dischargeability on behalf of CSA.

By stipulation, the sole issue in dispute is whether the debtor engaged in "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny," by imputation to the debtor of the former spouse's criminal behavior. 11 U.S.C. § 523(a)(4). This exception "was intended to reach those debts

8

incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Louisiana Marine Towing, LLC v. Bertrand (In re Bertrand)*, 2011 WL 3664474(Bankr.W.D.La. 8/19/2011)(*quoting Miller v. J.D. Abrams Inc.*, 156 F.3d 598, 602 (5th Cir.1998) (*quoting Boyle v. Abilene Lumber, Inc., (In re Boyle)*, 819 F.2d 583, 588 (5th Cir.1987)). Nevertheless, the Court notes that "while acting in a fiduciary capacity" only qualifies "fraud or defalcation," not "embezzlement or larceny." It is undisputed that no fiduciary relationship existed between the Plaintiffs and the debtor, such that the fiduciary fraud exception cannot be applicable as to the debtor himself.

"Defalcation" is a willful neglect of duty, and a willful neglect of duty by a person owing a fiduciary duty is evaluated by a "recklessness standard," and Plaintiffs have not argued that Donna Kerry's actions were a result of willful neglect or "defalcation," but rather an intentional theft. *See The Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir.2001). But did the Plaintiffs prove that Donna Kerry committed fiduciary fraud under §523(a)(4)? In determining the elements of fraud in this section, the Court may refer to §523(a)(2)(A): to establish actual fraud, the plaintiff must prove that: (1) the debtor made false representations; (2) the debtor knew the representations were false at the time they were made; (3) the debtor made the representations with the intent to deceive plaintiffs; (4) the plaintiff relied on these misrepresentations; and (5) the plaintiff's injury was sustained as a proximate result of the representations made by debtors. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir.1995); *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991).[6] To the extent that Donna Kerry misrepresented the true payee of the checks and falsely listed legitimate business expense recipients as the payees of certain checks, the Court finds she acted fraudulently. Fraud in this context requires, however, the existence of a fiduciary obligation. Regardless of whether Donna Kerry's theft can be construed a fraud, there must exist for this element of §523(a)(4), the fiduciary relationship between herself and the Plaintiffs.

Plaintiffs repeatedly assume in their allegations that Donna Kerry acted in a fiduciary capacity in her employment, and much is made of the pre-trial stipulation to that effect by the defendant (*See* Doc.

---

[6] Section 523(a)(2)(A) provides in pertinent part that the discharge does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing or credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; (B) use of a statement in writing— (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

9

93, ¶4). Plaintiffs presumably rely on Louisiana Law, regarding the imposition of a fiduciary obligation as set forth in La.R.S. 9:3801: "Fiduciary includes a trustee under any trust, expressed, implied resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other persons acting in a fiduciary capacity for any person, trust or estate." This broad definition of "fiduciary," ancillary to the Louisiana La.Civ.Code art.2989 on Mandate, is further defined by the Louisiana Supreme Court: "The defining characteristic of a fiduciary relationship . . .is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor." *Plaquemines Parish Commission Council v. Delta Development Co., Inc.*, 502 S.2d 1034, 1040 (La. 1987).     And under longstanding Louisiana law, an employee owes a duty to his employer to be loyal and faithful to the employer's interest in business. *Neal v. Daniels* 217 La. 679, 682-683, 47 So.2d 44 (La. 1950).

Nevertheless, whether a fiduciary relationship existed for purposes of the §523(a)(4) exception is not a matter of fact subject to stipulation, but rather a question of federal law, although state law determines whether a trust obligation exists in a particular situation. *Gupta v. Eastern Idaho Tumor Institute, Inc (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004). Under federal law, consistent with the principle that exceptions to discharge are to be narrowly construed, the concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law, such that the fiduciary obligation is limited to instances involving express or technical trusts. *Texas Lottery Comm'n v. Tran (Matter of Tran)*, 151 F.3d 339, 342 (5th Cir. 1998)(*citing Chapman v. Forsyth*, 43 U.S. (2 How.) 202 (1884).

> Statutory trusts, by contrast, can satisfy the dictates of § 523(a)(4). It is not enough, however, that a statute purports to create a trust: A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties. The question whether a state statute creates the type of fiduciary relationship required under § 523(a)(4) is one of federal law.

*Matter of Tran*, 151 F.3d at 343 (footnotes omitted), *citing Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1341 (5th Cir. 1980).

"Fiduciary" as applied in § 523(a)(4) requires that an express or technical trust exist between the debtor and the creditor. *Bell v. Berry (In re Berry)*, 174 B.R. 449(Bankr.N.D.Tex.,1994)(*citing Pisoni v. Hodges (In re Hodges)*, 115 B.R. 152, 155(Bankr.S.D.Ill. 1990) and *In re Chavez* 140 B.R. 413, 423(Bankr.W.D.Tex. 1992). Therefore, "an explicit proclamation of a trust relationship, a clearly defined trust res, and the intent to create such a relationship" must be present before the court will find a fiduciary relationship exists under § 523(a)(4). *Id.* at 453. An implied trust, one imposed on a transaction by

10

operation of law as an equitable matter, will not satisfy the requirements of § 523(a)(4). *Id.*, at 454 (citations omitted). "[T]o create an express trust the legal and equitable titles must be separate, the former being vested in a trustee and the latter in a beneficiary." *Id.*, at 454 (*quoting Miller v. Donald*, 235 S.W.2d at 205). "Furthermore, a debtor is not a fiduciary, within the meaning of § 523(a)(4), when the debtor is merely in the position of an agent, bailee, broker, factor, partner, or other similarly situated person, unless some additional fact is shown. <u>Collier on Bankruptcy</u>, ¶ 523.14 (15th ed.)." *Id.*, at 454.

Here, there is absolutely no evidence of an expressed, explicit proclamation of a trust or fiduciary relationship between Donna Kerry and the Plaintiffs, and further, Plaintiffs do not even allege that such a trust over a particular *res* ever existed. A cause of action under § 523(a)(4) for fiduciary fraud exists only where the debtor was designated a trustee over particular money or property (the trust res) by virtue of an express or statutory trust, and the debt consists of the loss of the money or property entrusted to the debtor. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power is sufficient to establish a fiduciary relationship for purposes of dischargeability." *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir.1996)(citations ommitted). Moreover, "the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy." Constructive, resulting, and implied trusts are excluded, as are other "trusts" that arise only upon the commission of a wrong. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153)(1934).

In this instance, the mere existence of the employment relationship does not rise to the level of a fiduciary obligation under §523(a)(4) merely by the permission to perform certain duties in the office setting, notwithstanding the extensive lack any oversight by the employer over that employee as was shown at trial. In fact, the Plaintiffs attempted to establish at trial that the extent of Donna Kerry's authority while employed as office manager was practically unlimited, in effort to support their notion that she was a fiduciary by virtue of the control she exerted in her position. While the Court acutely recalls the testimony of Dr. Granger being that he was Donna Kerry's supervisor, and in particular that he admitted he should have exercised better supervision and should have implemented certain "checks and balances" within his office procedure, the Court will address the "extent of control argument." The United States Court of Appeal for the 5th Circuit recently revisited the issue of fiduciary status under §523(a)(4) in *B&W Finance v. Harwood (In re Harwood)*, 637 F.3d 615 (5th Cir. 4/5/2011), wherein it found acts of fiduciary defalcation committed by a debtor who had been an officer, director, chief executive officer and investing partner in the general partnership of the creditor - limited partnership, but who was not himself a partner of the creditor, a when that debtor/partner failed to secure personal loans made by the partnership to himself. In that case, the 5th Circuit relied on its precedent *in In re Bennett* to

11

focus on the issue of managerial control in deciding "whether to impose fiduciary responsibilities on individuals whose actions directly determine the conduct of a general partner or limited partnership." *In re Harwood*, 637 F.3d at 621; *In re Bennett*, 989 F.2d 789(5th Cir.1993). In *Harwood*, the Court was faced with the judging the acts of defalcation of a managing partner who unquestionably owed a fiduciary duty to the general partnership, but did he also owe a fiduciary duty to the limited partnership owned in part by the general partnership, over which the he exercised management control? The Court found that he did in fact owe a fiduciary duty to the creditor/limited partnership based on the level of control he exercised over its daily operation. Notwithstanding the fact that the Court found a fiduciary obligation even in an attenuated relationship, the facts of Harwood are vastly distinguishable from the facts at bar however, in that Donna Kerry was not a member of Cardiovascular Surgery of Alexandria, had no partnership relationship with Dr. Granger, and was employed merely as an office manager who was required to seek permission from Dr. Granger when exercising the authority he gave her. According to Dr. Granger's testimony, she had no check signing authority, and did not "directly determine the conduct of" the L.L.C. Here, Dr. Granger seeks to impose a fiduciary relationship upon an employee he admits he failed to adequately supervise, but one cannot superimpose a fiduciary obligation *ex post facto*, it must have been express and precise before that act of fraud or defalcation. The trust relationship "must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. Constructive trusts or trusts ex malificio thus also fall short of the requirements of § 523(a)(4)." *Matter of Tran*, 151 F.3d at 343(*citing Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 154 (1934).

Further, *In re Yoshida* evaluates the application of §523(a)(4) in light of the employee's status as a manager:

> The only fact alleged by GUJ in its complaint to support the claim of a fiduciary relationship is Yoshida's employee/manager status. However, an employment relationship alone does not give rise to a fiduciary relationship for purposes of § 523(a)(4). *See E.L. Hamm & Assoc. v. Sparrow (In re Sparrow)*, 306 B.R. 812, 832 (Bankr.E.D.Va.2003); *Adamo v. Scheller (In re Scheller)*, 265 B.R. 39, 52 (Bankr.S.D.N.Y.2001); *Solar Systems and Peripherals, Inc. v. Burress (In re Burress)*, 245 B.R. 871, 877–78 (Bankr.D.Colo.2000); *Community Mutual Sav. Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 311 (Bankr.S.D.N.Y.1994); *BPS Guard Servs. v. Myrick (In re Myrick)*, 172 B.R. 633, 636–37 (Bankr.D.Neb.1994). Nor does the elevation of an employee to a managerial position bring into being a fiduciary relationship within the purview of § 523(a)(4). *See Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 698–99 (holding that management level employee responsible for evaluating contractor bids and against whom a state court judgment was obtained for breach of fiduciary duty of loyalty and commercial bribery was not acting in a fiduciary capacity within meaning of § 523(a)(4)); *Colonial–Interstate, Inc. v. Ayers (In re Ayers)*, 83 B.R. 83, 88 (Bankr.M.D.Ga.1988) (holding that defendant, a former manager of plaintiff was merely an agent or factor of plaintiff and did not assume a fiduciary capacity sufficient to render his debt nondischargeable); *DL & B Oil Co. v. Dawson (In re Dawson)*, 16 B.R. 343, 346 (Bankr.N.D.Ill.1982) (Operator of gasoline service station, even though a "trusted agent" of the owner, is not a fiduciary in the strict and narrow sense used in the Bankruptcy

12

Code.); *Mullis v. Walker (In re Walker)*, 7 B.R. 563, 564 (Bankr.M.D.Ga.1980) (Under § 523(a)(4), "[a] service station manager, even though he has the responsibility of collecting proceeds of sales from the station, accounting therefor and depositing cash amounts thereof, is not a fiduciary.").

*In re Yoshida*, 435 B.R. 102, 109-110 (Bankr.E.D.N.Y. 8/23/2010).

For purposes of § 523(a)(4), this Court finds no fiduciary relationship existed between the Plaintiffs and Donna Kerry. Plaintiffs failed to prove the existence of an express, technical or statutory trust, or any other cognizable fiduciary connection. By extension, this Court cannot, as Plaintiffs suggest, impute to the debtor an act which the actor herself has not committed; i.e., if Donna Kerry was not a fiduciary under §523(a)(4), and thus could not have committed a fiduciary fraud or defalcation, then the same could not be imputed to the former spouse.

The Court must next examine whether Donna Kerry's actions were "larceny" or embezzlement," as such definitions under §523(a)(4) are matters of federal law. Larceny is defined as the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property." *DiCrispino v. Adams (In re Adams)*, 348 B.R. 368, 373(Bankr.E.D.La. 8/25/2005)(*citing In re Hartman*, 254 B.R. 669, 674(Bankr.E.D.Pa. 2000)). It differs from embezzlement because the initial taking of the victim's property must be unlawful. Fraudulent intent is essential to both larceny and embezzlement. *Adams*, 348 B.R. at 373, *citing Hartman*, 254 B.R. at 674; Collier on Bankruptcy, 16th Ed. ¶523.10[2].

"Embezzlement for purposes of §523(a)(4) is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Miller*, 156 F.3d at 602; *Smith v. Hayden (In re Hayden)*, 248 B.R. 519, 525 (Bankr . N.D.Tex.2000); *RAI Credit Corp. v. Patton (In re Patton)*, 129 B.R. 113, 116 (Bankr.W.D.Tex.1991). Embezzlement requires a showing that: "(1) the debtor appropriated funds, (2) the appropriation was for the debtor's use or benefit, and (3) the debtor did the appropriation with fraudulent intent." *Hayden*, 248 B.R. at 525. Larceny is "the fraudulent and wrongful taking away of the property of another with the intent to convert it to the taker's use and with intent to permanently deprive that owner of such property." *Id.* at 526 (citations and emphasis omitted). "[S]ection §523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore embezzlement." "To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property." Id. at 602-03. Without revisiting the method by which Donna Kerry stole funds from CSA, the Court does find, more than sufficient evidence

13

to prove by preponderance that Donna Kerry embezzled funds from CSA when she issued checks over which she was permitted to write but not authorized to sign with signature stamp or to write to herself for non-business expenses.

## Imputation

"Plaintiffs have consistently asserted that fault should be imputed to Defendant because he had actual and/or constructive knowledge that his wife stole from Granger; he made Donna Kerry his agent; and should be held accountable for the misdeeds of his agent." (Doc. #99, Post-Trial Reply Brief, pg. 2.) In support of this assertion, Plaintiffs rely almost exclusively on the strikingly factually similar case of *Taylor Freezer Sales of Arizona, Inc. v. Oliphant (In re Oliphant)*, 221 B.R. 506 (Bankr.D.Ariz. 1998). Therein, as here, plaintiff/former-employer of ex-wife sought to impute liability of the non-filing, criminally liable ex-wife to the debtor/ex-husband and under §523(a)(2), after the ex-wife, who was employed by plaintiff as an office manager for six years, had over that time period embezzled nearly $500,000. Just as here, funds embezzled by the ex-wife has been deposited into the checking account and used to pay community debts. Plaintiff therein alleged: "Ms. Oliphant's fraud and embezzlement is attributable to Debtor's portion of the marital community because (1) Debtor knew or should have known that the receipt of nearly half a million dollars into the community was obtained by fraud; (2) Ms. Oliphant's actions were done on behalf of the marital community; and (3) Debtor, individually and as a member of the marital community, benefitted and shared in the fraudulently received monies." *Oliphant*, 221 B.R. at 508. One significant factual difference in that case is that both Mr. and Mrs. Oliphant paid the bills of the household.[7]

The *Oliphant* Court found:

> Fraudulent intent will not be presumed. *In re Bursh*, 14 B.R. at 705–06. As stated earlier, however, it may be proven inferentially. The "innocent" spouse's knowledge of the other spouse's fraudulent conduct may be relevant to an inference of fraudulent intent, depending on the nature and extent of such knowledge and on whether there are other relevant facts that bolster the inferential value of the knowledge. In certain cases, knowledge itself may be inferred where the facts and circumstances are so egregious that denial of knowledge is simply not credible. Fraudulent intent also may be inferred from other facts. For example, the nature and extent of the benefit conferred to the "innocent" spouse may be so great or unusual that it is reasonable to conclude that the "innocent" spouse engaged in fraudulent activity him or herself.

> Under this test, this Court believes Plaintiff's complaint sufficiently alleges fraudulent intent to survive a motion to dismiss. *Whether the facts are sufficient to support judgment in favor of Plaintiff is another question.*

---

[7] "Plaintiff presented evidence that portions of the money were deposited directly into the couple's joint checking account and used *by both* to pay bills." *Oliphant*, 221 B.R. at 508 (emphasis supplied).

14

*Oliphant*, 221 B.R. at 511(emphasis supplied).

Despite the incredible congruence of facts between Oliphant and the case at bar, the problem with relying so heavily on the opinion of the Arizona Bankruptcy Court is that its success for the Plaintiffs is short-lived. Like in this case, the Court in Oliphant held merely that that the complaint against the "innocent" spouse survived a Motion to Dismiss under F.R.B.P. 7012, which also happened in this caseon appeal and remand from the District Court. Plaintiffs fail to inform the Court that the Oliphant decision on Motion to Dismiss did not ultimately lead to a finding of non-dischargeability as to the entire $473,000 demanded. In fact, the record of *Taylor v. Oliphant*, 97-214 (Bankr. D. Ariz.) reflects that after the Motion to Dismiss was denied, the parties entered settlement negotiations, resulting in a stipulated Judgment that only $125,000 of the $473,000 demand would be held non-dischargeable as to Mr. Oliphant, reinforcing the notion herein that the determination of whether the fault of the ex-spouse should be imputed to the "innocent" spouse is highly fact intensive and reliant on credibility, and Plaintiffs are required to prove by a preponderance of the evidence the extent to which debtor spouse knew of the illegal activity of the ex-spouse. Plaintiffs urging that debtor should have known are really just asking the Court to determine whether the debtor did in fact know, and to what extent did he in fact benefit, but is merely disingenuous in his complete denial of knowledge and/or participation. Rather, to find that debtor *should have known*, without evidence that he did in fact know, in applying the §523(a)(4) exception, would have the effect of stripping away the scienter element found in §523(a)(4) as to the innocent spouse, but requiring that element be met as to the spouse from whom the liability is imputed. On the contrary, absent a preponderance of the evidence showing Mr. Kerry actually knew of his wife's scheme to steal from her employer, "the Code does not allow attribution of intent from spouse to spouse." *First Texas Savings Assoc., Inc. v. Reed (Matter of Reed)*, 700 F.2d 986, 993 (5th Cir.1983).

Plaintiff's argue that the division of responsibilities in the former Kerry household and marriage were such that Mr. Kerry made Mrs. Kerry his agent in fact, subjecting him to liability under the principles of agency (or mandate, in Louisiana), pointing to the fact that Mrs. Kerry paid all the household bills, made all purchasing and vacation arrangements and deposited all of Mr. Kerry's paychecks. However, even the *Oliphant* Court conceded, relying on our own controlling precedent in *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 485 (5th Cir. 1992), that "for agency principles to apply, it is not enough that debtors are spouses; a business relationship between the spouses must exist."

In *Allison*, the bankruptcy court found that Mr. Allison "effected an intentional and purposeful deception" by feigning agreement to limit the amount of his first mortgage, inducing the creditor to sign the deeds of conveyance when, in fact, borrowed an amount far exceeding that limit, but that Mrs. Allison

15

was not present and "was not aware of any agreement to limit the amount of mortgages placed on the property." *In re Allison*, 960 F.2d 481, at 485 (5ᵗʰ Cir. 1992). The Court held:

> The agency theory has been applied to impute the fraudulent acts of one spouse to the other in cases in which the other spouse was involved in a business or scheme. *See e.g., In re Luce*, 960 F.2d 1277 (5th Cir.1992) (spouse partner in business); *In re Smith*, 98 B.R. 423 (Bankr.C.D.Ill.1989) (spouse lied to obtain business license for acting spouse); *In re Paolino*, 89 B.R. 453 (Bankr.E.D.Pa.1988) (spouse expressly agreed that other spouse could act as agent with at least some knowledge of planned acts). We find no evidence in the record linking Phyllis Allison to false or fraudulent acts or plans. Considering the *statutory requirement* for fraud involving *moral turpitude or intentional wrong*, we perceive no basis for applying the agency fraud theory to Phyllis Allison. *See In re Gallaudet*, 46 B.R. 918 (Bankr.D.Vt.1985).

*In re Allison*, 960 F.2d 481, at 485 (5ᵗʰ Cir. 1992)(emphasis supplied); *See also Luce v. First Equip. Leasing Corp.* (In re Luce), 960 F.2d 1277 (5ᵗʰ Cir. 1992); *In re Gautier*, 349 Fed.Appx. 943 (5ᵗʰ Cir. 2009).

The Oliphant Court footnoted that when the 8ᵗʰ Circuit addressed a similar case where the culpable spouse took over her husband's business when he fell ill, the Court imposed on the "innocent" spouse an affirmative duty to have "paid at least some attention to the affairs of his business and discovered the fraud." *In re Oliphant*, 221 B.R. at 511, fn. 3 (*citing In re Walker*, 726 F.2d 452, 454 (8ᵗʰ Cir. 1984). But even there, some element of a spousal business relationship existed, a detail that is completely lacking in this case.

At the end of the day, bankruptcy law favors permitting a debtor to discharge his debts, thereby affording him the proverbial "fresh start." *Matter of Tran*, 151 F. 3d 339, 342 (5ᵗʰ Cir. 1998)(*quoting Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 113-14, (1970) (describing purposes of bankruptcy law to give debtor a " 'new opportunity in and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'") (citation omitted). These Plaintiffs have failed to meet the burden of proving by a preponderance of the evidence of the evidence that the criminal actions of debtor's former spouse should be imputed as the debtor's own active misconduct as to this creditor. Instead, the plaintiff has literally failed to produce even a scintilla of evidence implementing Mr. Kerry in any scheme or personal knowledge of the unlawful acts of the former spouse. Every piece of evidence offered by Plaintiffs and admitted into evidence, including the testimony of Dr. Granger and the deposition of Donna Kerry, actually support Mr. Kerry's assertion that he never suspected or knew of his ex-wife's scheme to embezzle funds from CSA.

## CONCLUSION

JUDGMENT FOR DEFENDANT.   A separate and conforming order will enter.

16